**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**West Palm Beach Division**
**www.flsb.uscourts.gov**

In re:                                          Case No. 20-14792
                                                Chapter 11
TOOJAY'S MANAGEMENT LLC and                     (Pending Joint Administration)
TOOJAY'S ACQUISITION LLC

       Debtors.

_____/

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO USE CASH COLLATERAL AND PROVIDE ADEQUATE PROTECTION

**(Emergency Hearing Requested for Friday, May 1, 2020)**

### STATEMENT OF EXIGENT CIRCUMSTANCES

**The Debtors request an emergency hearing in this matter on April 29, 2020. Without the immediate authorization to use cash collateral and provide adequate protection as detailed herein, the Debtors will be irreparably harmed because the Debtors will not be able to acquire goods and services necessary for its day-to-day operations or generally maintain and preserve the going concern, enterprise value of the business.**

Debtors seek the entry of an Order authorizing Debtors to use their cash collateral on an interim and final basis pursuant to the terms of the existing Pre-Petition Senior Secured Loan Agreements and Pre-Petition Subordinated Secured Loan Agreements (terms defined below), providing the Monroe Lenders (defined below) with adequate protection as detailed herein

pursuant to 11 U.S.C. Sections 361 and 363 and scheduling a final hearing (the "Motion"),[1] and in support thereof states as follows:

## PRELIMINARY STATEMENT

Debtors have owned and operated over 30 restaurant/delicatessens chains  across the state of Florida  since 1981 when the first deli was opened in Palm Beach.   These restaurants are open for breakfast, lunch and dinner and are well-known for the wide selection of menu options that include handcrafted sandwiches, made-from-scratch soups, salads, and baked goods.   Prior to the COVID-19 pandemic and the unprecedented closures of businesses required by local governments, Debtors' businesses were operating profitably and there were even plans to expand the chain into additional parts of Florida and the southeast region of the United States.

Since the pandemic, sales have reduced dramatically.  Although the Debtors have taken proactive measures to reduce expenses wherever possible, including reducing the number of full-time employees from 1,114 down to a minimal staff of 280, the Debtors' fixed operating costs make it challenging for it to maintain its profitability and other key financial health metrics required by their Monroe Lenders.   In the interest of stabilizing its operations until closures related to COVID-19 are lifted, Debtors recently obtained a $6,400,000 loan under the Paycheck Protection Program ("PPP") which it plans to use for payroll and other expenses allowed under the PPP, including future rent.

The filing of these chapter 11 bankruptcy actions was necessitated solely because of the COVID-19 pandemic.  These cases will provide the Debtors a single venue in which to negotiate

---

[1] In support of the Motion, the Debtors rely on the *Declaration of Max Piet in Support of Chapter 11 Petition and First Day Motions* to be filed with the Court (the "First Day Declaration"). The Motion is being filed pursuant to 11 U.S.C. Sections 361 and 363, Bankruptcy Rules 4001 and 9014, Local Rules 9013-(F) and (G), and this Court's *Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing* (the "Court Guidelines").

52924769;1

a plan of reorganization and to work with all of their existing landlords to address the impact of the revenue reductions resulting from the state and city regulations mandating the closure of the dining room at all restaurants.

The Debtors operated profitably for many years and are well known in the locations in which they operate. They enjoy a good reputation. The Debtors project that the lifting of closures anticipated over the next two months will enable them to rehabilitee their businesses.

## **RELIEF REQUESTED**

An immediate and critical need exists for the Debtors to be granted permission to use Cash Collateral (defined below) enabling them to continue operating and preserving their businesses and importantly, the ongoing, enterprise value. The Debtors will be irreparably harmed if the relief requested is not granted. Thus, the Debtors are requesting that the Court pursuant to Federal Rules of Bankruptcy Procedure 4001(b)(2) and Local Rules 4001-2, 9013-1(F) and (G): *i)* schedule an emergency interim hearing ("Interim Hearing") on the Motion in accordance with local rules 9013-1(F); *ii)* enter the proposed Interim Order attached hereto as Exhibit B; *iii)*; schedule a final hearing ("Final Hearing") on this Motion for approximately 30 days after the conclusion of the Interim Hearing; and, *iv).* provide the Monroe Lenders (defined below) with adequate protection in the form of: (i) replacement liens securing any cash collateral used by the Debtors that are equal in validity and priority as any liens the Monroe Lenders held against the Debtors' collateral as of the commencement of this case; (ii) monthly adequate protection payments of $140,000; and (iii) monthly reporting requirements.

## JURISDICTION

1.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409(a).

2.       The statutory predicates for the relief requested herein are sections 105, 361, 362, and 363 of title 11 of the United States Code ("Bankruptcy Code"), Rules 2002, 4001, 6003 and 9012 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Local Rules 4001-2, 9013-1(F) and (G), and the court's "Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing" ("Local Rules").

## FACTS RELATED TO RELIEF REQUESTED

3.       On April 29, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Since that time, the Debtors have operated as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. As of the date hereof, no creditors' committee has been appointed in this case. In addition, no trustee or examiner has been appointed. For a detailed description of the Debtors, their operations and assets and liabilities, the Debtor respectfully refers the Court and parties-in-interest to the First Day Declaration to be filed.

4.       Any cash or cash equivalents, funds or proceeds of or derived from certain of the collateral securing the obligations of the Debtors to the Monroe Lenders and Brookside Lenders under the Pre-Petition Senior Secured Loan Agreements and Pre-Petition Subordinated Secured Loan Agreements (defined below) constitute cash collateral within the meaning of Section 363 of the Bankruptcy Code (the "**Cash Collateral**"). The Cash Collateral includes, without limitation, the Debtor's cash or cash equivalents maintained in the Debtor's bank accounts and

proceeds received by the Debtors from the sale of goods and services and collection of accounts receivables.

5.      As of the Petition Date, the total claims of all secured and unsecured debt of Debtors was less than $50,000,000 and is summarized as follows:

|  | TooJay's Management LLC |
|---|---|
| Current liabilities (unsecured) | $10,254,407 |
| Long-term liabilities - deferred rent (unsecured) | $2,643,076 |
| Long-term debt (secured) | |
|     Term loan | $21,522,500 |
|     Operating revolving loan | $1,000,000 |
|     Term loan (growth and capital improvements) | $2,992,500 |
|     Mezzanine debt | $7,265,236 |
| TOTAL CLAIMS | $45,677,719 |

6.      Prior to the Petition Date, the Debtors entered into certain secured financing agreements with various lenders.  The primary lending agreement providing for principal up to $26,000,000 is that certain Credit Agreement dated as of October 26, 2018 by and between TJ Acquisition, LLC, TooJay's Management LLC, each of the subsidiaries of TooJay's Management LLC, Monroe Capital Management Advisors, LLC (hereinafter "Monroe Administrative Agent"), and various financial institutions known as Monroe Capital Corporation, Monroe Capital Private Credit Fund II LP, Monroe Capital Private Credit Fund II (Unleveraged) LP, Monroe Capital Private Credit Fund III LP, Monroe Capital Private Credit Fund III (Unleveraged) LP, Monroe Private Credit Fund A LP, Monroe Capital Private Credit Fund I LP, and MC Financing SPV I, LLC (hereinafter collectively "Monroe Lenders").  The borrowers under the Credit Agreement are TooJay's Management LLC and its operating subsidiaries.

7.     The Monroe Lenders claim a security interest in cash collateral through a revolving line of credit, a term loan extended for non-growth expenditures, and a term loan intended for build-out of new sites and capital expenditures.  The Credit Agreement was further secured by that certain Guaranty and Collateral Agreement dated October 26, 2018 by and between TJ Acquisition, LLC, TooJay's Management LLC, all of TooJay's Management LLC's operating subsidiaries and Monroe Administrative Agent.  ("Monroe Guaranty and Collateral Agreement").  A true and correct copy of the Monroe Credit Agreement and Monroe Guaranty and Collateral Agreement (collectively referred to as "Pre-Petition Senior Secured Loan Agreements") are attached as Composite Exhibit C.  A summary of the loan commitments for each of the Monroe Lenders is summarized below:

| Name of lender | Revolving commitment | Term A loan commitment | Total B loan commitment | TOTAL |
|---|---|---|---|---|
| Monroe Capital Corporation | $159,090.91 | $3,500,000.00 | $477,272.72 | $4,136,363.63 |
| Monroe Capital Private Credit Fund II LP | $120,049.40 | $2,641,086.90 | $360,148.21 | $3,121,284.51 |
| Monroe Capital Private Credit Fund II (Unleveraged) LP | $16,314.23 | $358,913.10 | $48,942.70 | $424,170.03 |
| Monroe Capital Private Credit Fund III LP | $216,005.51 | $4,752,121.20 | $648,016.53 | $5,616,143.24 |
| Monroe Capital Private Credit Fund III (Unleveraged) LP | $56,721.76 | $1,247,878.80 | $170,165.29 | $1,474,765.85 |
| Monroe Private Credit Fund A LP | $250,000.00 | $5,500,000.00 | $750,000.00 | $6,500,000.00 |
| Monroe Capital Private Credit Fund I LP | $136,363.64 | $3,000,000.00 | $409,090.91 | $3,545,454.55 |
| MC Financing SPV I, LLC | $45,454.55 | $1,000,000.00 | $136,363.64 | $1,181,818.19 |
| TOTAL | $1,000,000.00 | $22,000,000.00 | $3,000,000.00 | $26,000,000.00 |

8.     The Debtors also obtained pre-petition secured loans in the principal amount of $7,000,000 from two mezzanine lenders.  The primary lending agreement is that certain Amended and Restated Securities Purchase Agreement dated September 14, 2015 by and between TooJay's Management LLC, TJ Acquisition LLC, each of the subsidiaries of TooJay's Management LLC, and two financial institutions known as Brookside Mezzanine Fund II, L.P. and Brookside Mezzanine Fund III, L.P. (hereinafter collectively "Brookside Lenders"). ("Brookside Amended and Restated Securities Purchase Agreement"). TooJay's Management

LLC executed two Amended and Restated Senior Subordinated Notes in favor of the Brookside Lenders due March 14, 2021 on September 14, 2015 that further memorialized the terms of the Amended and Restated Securities Purchase Agreement. ("Brookside Notes"). These mezzanine loans were further secured by that certain Amended and Restated Guaranty and Security Agreement dated September 14, 2015 by and between TooJay's Management LLC, TJ Acquisition, LLC, all of the subsidiaries of TooJay's Management LLC, and the Brookside Lenders. ("Brookside Amended and Restated Guaranty and Security Agreement"). The terms of the Brookside Amended and Restated Securities Purchase Agreement were subsequently modified by three different amendments, the first of which was executed on May 27, 2016, the second on July 6, 2017, and the third on October 26, 2018 (collectively "Brookside Amendments"). A true and correct copy of the Brookside Amended and Restated Securities Purchase Agreement, Brookside Amended and Restated Guaranty and Security Agreement, Brookside Notes, and Brookside Amendments (collectively referred to as "Pre-Petition Subordinated Secured Loan Agreements") are attached hereto as Composite Exhibit D. A summary of the original principal amounts for each of the Brookside Lenders is as follows:

| Name of secured lender | Principal |
| --- | --- |
| Brookside Mezzanine Fund II, L.P. | $3,500,000.00 |
| Brookside Mezzanine Fund III, L.P. | $3,500,000.00 |
| TOTAL | $7,000,000.00 |

3.      The Monroe Lenders and Brookside Lenders both claim a lien against the Debtors' Cash Collateral for the purpose of  securing the Debtors obligations under their respective loan documents.   The Monroe Lenders also claim a security interest in the Debtors' personal property, intellectual property, account receivables and any equity interests. The

Brookside Lenders also claim a security interest in the Debtors' fixtures ) and other personal property, whether tangible or intangible, and also pledged stock. (See Composite Exhibits C and D).

4.      The lenders are parties to a Subordination and Intercreditor Agreement dated October 26, 2018, which seemingly subordinates the Brookside Lenders claimed liens to the claimed liens of the Monroe Lenders. A copy of the Subordination and Intercreditor Agreement is attached hereto as Exhibit E.

5.      A list of UCC-1 Financing Statements and their document numbers filed against the Debtors in the State of Florida is attached as Exhibit F. The Debtors are obtaining any UCC-1 Financing Statements filed in Delaware against them which documents are not available online.

6.      The Debtors estimate that the value as of April 29, 2020 of the cash collateral is (i) $5,759,149 in case and cash equivalents; and (ii) $619,202 in accounts receivable. The Debtors estimate that the value as of April 29, 2020 of the fixed assets is (i) $592,712 in inventories and suppliers; (ii) $14,818,075 in equipment and leasehehold improvements; and (iii) $25,235 in deposits and other assets. Prior to the COVID-19 pandemic, annual EBITDA on a consolidated basis exceeded $6,700,000 based on the February 2020 trailing twelve month period. If market multipliers for similarly situated restaurant chains were applied to EBITDA for the Debtors' pre-pandemic businesses, and, Debtors anticipate that the enterprise value expected once operations stabilize post-pandemic would be between $44,000,000 and $50,000,000. Since the total value of the Senior Secured Debt and Subordinated Secured Debt total approximately $32,780,236, the value of the Debtors' enterprise far exceeds the value of any Lenders' liens.

7.     As of April 29, 2020, the Monroe Lenders claimed the approximate amount of $25,515,000 was due and owing them by the Debtors and the Brookside Lenders claimed the approximate amount of $7,265,236 was due and owing them by the Debtors.

8.     In the one-year period proceeding the commencement of this case, the net interest paid to the Monroe Lenders by the Debtors averaged $167,130 per month..

9.     In connection with the Debtors' proposed use of Cash Collateral hereunder and in order to provide the Monroe Lenders with adequate protection for the aggregate diminution of the Cash Collateral resulting from the Debtors' use thereof, the Debtors have agreed, subject to approval of this Court, that the Monroe Lenders, shall have, *nunc pro tunc* as of the commencement of this Chapter 11 case, a replacement lien pursuant to 11 U.S.C. §361(2) on and in all property of the Debtors acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the property of the Debtors securing the pre-petition obligations to the Monroe Lenders under the Pre-Petition Senior Secured Loan Agreements and Pre-Petition Subordinated Secured Loan Agreements.

10.     The Debtors also propose making monthly interest payments in the form of adequate protection payments in the amount of $140,000 per month to the Monroe Lenders (the "Adequate Protection Payments"). The Debtors will also furnish the Monroe Lenders with such financial and other information as required by the Pre-Petition Senior Secured Loan Agreements and Pre-Petition Subordinated Secured Loan Agreements or other reports as the Monroe Lenders may reasonably request. All replacement liens will be valid and perfected without the need for the execution or filing of any further documents or instruments.

11.     Prior to the COVID-19 pandemic, the Debtors' annual EBITDA on a consolidated basis exceeded $7,500,000. If market multipliers for similarly situated restaurant

chains were applied to EBITDA for the Debtors' pre-pandemic businesses, the enterprise value expected once operations stabilize post-pandemic would likely be between $54,000,000 and $65,000,000.  Thus, the value of the Debtors far exceeds the amounts claimed by the lenders.

12.    Section   361 of the Bankruptcy Code requires a debtor to provide adequate protection solely to preserve a secured creditor's interest in any collateral used by the debtor. Here, the Debtors do not propose providing the Brookside Lenders with adequate protection because, they are unsecured as to the Cash Collateral and precluded from such relief under the Intercreditor and Subordination Agreement.

12.    For the avoidance of doubt, the Monroe Lenders shall not have or be granted a replacement lien on or against any claims or causes of action arising under Sections 542 through 550 of the Bankruptcy Code (the "Avoidance Actions") or on or against the proceeds of the Avoidance Actions.

13.    The Debtors propose to use the Cash Collateral  in accordance with the terms of the Budget attached hereto as Exhibit A covering the 13-week period from May 5, 2020 through August 3, 2020.  The essential terms for the proposed use of Cash Collateral are as follows:

- Pay critical vendors, including those that supply food, gourmet products, and other consumable supplies necessary for the operation of the businesses;

- Pay necessary fixed operating expenses related to the real property occupied the Debtors;

- Pay employee wages and benefits to employees necessary to operating the various businesses;

- Pay the Estates' professional fees for the administration of the Chapter 11 cases; and

- Pay all Court fees and fees to the United States Trustee;

14.     The Debtors intend to utilize Cash Collateral for the next thirty days in an amount of $500,000 week.

15.     The Debtors also requests that they be authorized: (i) to exceed any line item on the Budget by an amount equal to ten percent (10%) of each such line item; or (ii) to exceed any line item by more than ten percent (10%) so long as the total of all amounts in excess of all line items for the Budget do not exceed ten percent (10%) in the aggregate of the total Budget.

16.     The Budget also reflects the Debtors' utilization of $6,400,000 recently obtained through the federal Paycheck Protection Program ("PPP").  The Debtors contend that the proceeds of the PPP does not constitute cash collateral.[2]  Yet, even if the PPP proceeds are included in Cash Collateral, the Monroe Lenders still remain adequately protected by virtue of the replacement liens and Adequate Protection Payments and the Brookside Lenders still remain

---

[2] Pursuant to the title II of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), § 1102 thereof entitled "Paycheck Protection Program" amends § 7(a) of the Small Business Act (15 U.S.C. 636(a)) and defines "allowable uses of covered loans" as follows:

(I)     payroll costs;
(II)    costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;
(III)   employee salaries, commissions, or similar compensations;
(IV)    payments of interest on any mortgage obligation (which shall not include any prepayment of or payment of principal on a mortgage obligation);
(V)     rent (including rent under a lease agreement);
(VI)    utilities; and
(VII)   interest on any other debt obligations that were incurred before the covered period.

unsecured as to the Cash Collateral. The Debtors also request that any replacement liens and administrative expense claims granted to the Monroe Lenders pursuant to the terms hereof be at all times subject and junior to: (i) the fees of the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; (ii) any court costs, and (iii) the fees and expenses for Court approved professionals for the Debtors in the amounts and as set forth in the Budget (collectively, the "Carve Out").

## BASIS FOR RELIEF REQUESTED

### I    THE COURT SHOULD ENTER AN ORDER AUTHORIZING THE USE OF CASH COLLATERAL BECAUSE THE MONROE LENDERS ARE ADEQUATELY PROTECTED.

12.    The Bankruptcy Code provides for the Debtors use of cash collateral with consent of secured creditors, with permission of the Court after notice and hearing. 11 U.S.C, § 363(c). The Court may condition use of cash collateral as is necessary to provide adequate protection. 11 U.S.C. § 362(e).

13.    Pursuant to the terms hereof, the Debtors will provide adequate protection to the Monroe Lenders as contemplated and required by Sections 361 and 363. The Bankruptcy Code does not explicitly define "adequate protection," but does provide a non-exclusive list of the means by which a debtor may provide adequate protection, including "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. *See* 11 U.S.C. § 361.

14.    What constitutes adequate protection must be evaluated on a case-by-case basis. *In re Swedeland Dev. Group Inc.,* 16 F.3d 552, 564 (3d Cir. 1994) *(citing In re O'Connor,* 808 F.2d 1393, 139697 (10th Cir. l987)); *In re Martin,* 761 F.2d 472, 476 (8th Cir. 1985). Adequate protection is meant to ensure that the secured lender receives the value for which it originally

bargained. *Swedeland*, 16 F.3d at 564 *(citing O'Connor,* 808 F.2d at 1396) ("the whole purpose of adequate protection for a creditor is to ensure that the creditor receives the value for which he bargained pre bankruptcy"). Courts have noted that "the essence of adequate protection is the assurance of the maintenance and continued recoverability of the lien value during the interim between the filing . . . and the confirmation." *In re Arriens,* 25 B.R. 79, 81 (Bankr. D. Or. 1982). The focus of the requirement is to protect a secured creditor from diminution in value during the use period. *See In re Kain,* 86 B.R 506, 513 (Bankr. W.D. Mich. 1988); *In re Becker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Ledgmere Land Corp.,* 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

15.    The Debtors' requested use of Cash Collateral and the protections afforded to the Monroe Lenders herein, including but not limited to, replacement liens, the Adequate Protection Payments and monthly reporting as required under the Pre-Petition Senior Secured Loan Agreements and Pre-Petition Subordinated Secured Loan Agreements.

II    **ALLOWING THE DEBTORS' TO USE THE CASH COLLATERAL WILL PRESERVE THE DEBTORS' GOING CONCERN VALUE INURING TO THE BENEFIT OF THE LENDERS, OTHER CREDITORS AND THE DEBTORS' ESTATES.**

16.    The continued operation of the Debtors' businesses will preserve and maintain their going concern and enterprise values. If the Debtors are not allowed to use the Cash Collateral, their business operations will be substantially interrupted resulting in a significant diminution in the value of the Debtors' assets (including the Cash Collateral) to the detriment of both the Monroe Lenders and Brookside Lenders, the lenders, other creditors and interest holders and the Debtors' estates. Moreover, the Debtors will suffer employee attrition, lost revenues, lost customers and damage to their goodwill.

17.     It is well established that a bankruptcy court, where possible, should resolve issues in favor of preserving the business of the debtor as a going concern:

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use "cash collateral" in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

*In re George Ruggiere Chrysler-Plymouth, Inc.,* 727 F.2d 1017, 1019 (11th Cir. 1984).

18.     Accordingly, courts authorize the use of cash collateral to enhance or preserve the debtor's going concern value. For example, in *In re Stein,* 19 B.R. 458 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral where the secured party was undersecured, finding that the use of cash collateral was necessary to the debtor's continued operations and the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]" *Id.* at 460; *see also In re Karl A. Neise, Inc.,* 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien on postpetition property acquired by debtor; debtor can use cash collateral "in the normal operation of their business"); *Federal Nat. Mort. v. Dacon Bolingbrook Assocs.,* 153 B.R. 204, 214 (N.D. Ill. 1993) (security interest protected to extent debtor reinvested rents in operation and maintenance of the property); *In re Constable Plaza Assoc.,* 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor's reinvestment of rents to maintain and operate office building "will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage"); *In re Dynaco Corp.,* 162 B.R. 389, 395-96 (Bankr. D.N.H. 1983) (finding that the alternative to the debtor's use of cash collateral, termination of its business, would doom reorganization and any chance to maximize value for all creditors).

**WHEREFORE**, the Debtors respectfully request that the Court enter the Interim Order:

(A) Authorizing the Debtors to:

(i) use the Cash Collateral in accordance with the Budget;

(ii) pay the Monroe Lenders the Adequate Protection Payments; and

(iii) grant the Monroe Lenders a replacement lien pursuant to 11 U.S.C. §361(2) on and in all property of the Debtors acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the property of the Debtors securing the pre-petition obligations to the Monroe Lenders under their loan documents;

(B) Scheduling a Final Hearing on the Motion for approximately thirty (30) days after the entry of the Interim Order on this Motion; and.

(C) For such other and further relief as the Court deems just and proper.

Date: April 29, 2020

**AKERMAN LLP**
*Proposed Attorneys for Debtors-in-Possession*
350 East Las Olas, Blvd., Suite 1600
Ft. Lauderdale, Florida 33301
Tel: (954) 463-2700 / Fax: (954) 463-2224

By: _/s/ Eyal Berger_____
   Joanne Gelfand, Esq.
   Florida Bar No 515965
   Joanne.gelfand@akerman.com
   Eyal Berger, Esq.
   Florida Bar No. 11069
   eyal.berger@akerman.com
   K. Ingrid Warrner, Esq.
   Florida Bar No. 794481
   Ingrid.warrner@akerman.com

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that on April 29, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day by transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this case.

<div style="margin-left:40%;">

**AKERMAN LLP**
*Proposed Attorneys for Debtors-in-Possession*
350 East Las Olas, Blvd., Suite 1600
Ft. Lauderdale, Florida 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224

B y :  /s/ *Eyal Berger*
      Eyal Berger, Esq.
      Florida Bar No. 11069

</div>

52924769;1