UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division
www.flsb.uscourts.gov

In re:                                                                                   Chapter 11

TOOJAY'S MANAGEMENT LLC,                                   Case No. 20-14792

        Debtor.
_____/

**DECLARATION OF EDWARD MAXWELL PIET IN SUPPORT OF
THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

    I hereby declare that the following is true based upon my personal knowledge of the business records of Debtor TooJay's Management LLC.

## I.    INTRODUCTION

    1.    My name is Edward Maxwell Piet. I am over the age of 18 and am competent to testify. I am the President and CEO of TooJay's Management LLC ("Management") (collectively with co-debtor TJ Acquisition, LLC ("Acquisition"), the "Debtors").

    2.    To minimize any adverse effects on the Debtors' businesses as a result of the commencement of this Chapter 11 case, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief and are designed to, among other things: (a) continue the Debtors' operations while in Chapter 11 with as little disruption as possible; (b) allow the Debtors to continue serving valued customers and operate their businesses pending a restructuring of Debtors' debt; and (c) establish procedures for the smooth and efficient administration of this case. The relief requested in the First Day Motions will be crucial to the success of the Debtors' efforts to facilitate an orderly reorganization to be effectuated through the contemplated restructuring of the Debtors' debts.

52923581;1

3. I submit this declaration (the "Declaration") in support of the Debtors' Chapter 11 voluntary petitions and the First Day Motions. As the President and CEO of Management, I have personal knowledge of the Debtors' books and records, and the Debtors' financial and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees or advisors. In making the statements herein based upon my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees to accurately record, prepare and collect any such documentation and other information.

4. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or my personal opinion, except as otherwise noted. I am authorized to submit this Declaration on behalf of the Debtors.

## II. BACKGROUND

**A.    The Chapter 11 Filing.**

5. On April 29, 2020 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").[1]

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: TooJay's Management LLC (0443) and TJ Acquisition, LLC (1455). The following additional affiliates of Debtors have or will file Chapter 11 Cases (collectively, "Filing Affiliates"): TooJay's Altamonte, L.L.C. (5466), TooJay's at Dr. Phillips, L.L.C. (8342), TooJay's Bakery & Commissary, L.L.C. (7016), TooJay's Boynton Oakwood Square, L.L.C. (3583), TooJay's Colonial, L.L.C. (6530), TooJay's Coral Springs, L.L.C. (5919), TooJay's Dania Beach, L.L.C. (2030), TooJay's Downtown Gardens, L.L.C. (0351), TooJay's Downtown Tampa, L.L.C. (5046), TooJay's Glades, L.L.C. (3884), TooJay's Hallandale, L.L.C. (4596), TooJay's Jupiter, L.L.C. (5986), TooJay's Lake Worth, L.L.C. (3353), TooJay's Naples, LLC (3336), TooJay's N Ft. Lauderdale, L.L.C. (8438), TooJay's of Lake Mary, LLC (0594), TooJay's of Ocoee, L.L.C. (9601), TooJay's of Sarasota, L.L.C. (7584), TooJay's of the Villages, L.L.C. (0798), TooJay's of West Boca, L.L.C. (8250), TooJay's Palm

6.      As of the date hereof, no official creditors committee has been appointed in this case. In addition, no trustee or examiner has been appointed.

7.      The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.    Overview of the Debtors' Corporate Structure.**

8.      Management is a limited liability company organized under the laws of the State of Florida.

9.      Affiliate is a limited liability company organized under the laws of the state of Delaware.

10.     Affiliate owns 100% of the outstanding membership interests in Management.

11.     The majority of the shares of Affiliate is owed by RGLA Holdings, L.L.C., BEP TooJays's L.L.C., Branford Chain, Inc., Brookside Mezzanine Fund II, L.P., and Brookside Mezzanine Fund, III, L.P.

**C.    Description of Debtors Businesses, Historical Financial Performance, and Reasons for Filing Chapter 11.**

12.     Debtors are in the business of owning and operating twenty-eight (28) TooJay's restaurants throughout the state of Florida, as well as a commissary and bakery. TooJay's is a restaurant that focuses on providing the recipes and flavors of an authentic deli. Many TooJay's restaurants are located at outlet malls or other large mixed-use retail properties. TooJay's has an extensive menu and focuses on handcrafted sandwiches, made-from-scratch soups, salads and baked goods and is open for breakfast, lunch, and dinner. TooJay's revenue streams come from its restaurants, take-out orders, delivery, and catering services. The headquarters of Management are located at 3654 Georgia Avenue, West Palm Beach, FL 33405. Management is the operating

---

Beach, L.L.C. (1908), TooJay's Plantation, L.L.C. (8882), TooJay's Stuart, L.L.C. (4505), TooJay's Vero, L.L.C. (0750), TooJay's Villages III, L.L.C. (5254), TooJay's VLG II, L.L.C. (2492), TooJay's Waterford Lakes, L.L.C. (9363), TooJay's Wellington Commons, L.L.C. (3967), and TooJay's West Palm Beach, L.L.C. (4685).

52923581;1

entity that employs and pays the restaurant employees. Management is the 100% owner of its affiliates which affiliates lease their individual premises of the restaurants.

13. Prior to the COVID-19 pandemic and subsequent closures required by local governments, Debtors' businesses were operating profitably and there were plans to expand the chain into additional parts of Florida and the southeast region of the United States. Beginning in March 2020, the COVID-19 pandemic has caused the temporary or indefinite closure of the majority of Debtors' restaurants and seriously affected the Debtors' operations, revenues, and workforce. Although Debtors have taken proactive measures to reduce expenses wherever possible, including reducing the number of full-time employees and the fixed operating costs associated with Debtors' businesses making it challenging for Debtors to maintain profitability and other key financial health metrics that they are required to maintain by their lenders. As of March 29, 2020, Management was down to 290 full-time employees, compared to 1,114 at the end of February of 2020, and compared to 1,635 employees as of March of 2019. The reduction in sales has made it difficult for TooJay's to maintain the level of profitability to which it has historically enjoyed and which it needs to continue operating its businesses.

14. In the interest of stabilizing their operations until closures related to COVID-19 are lifted, Debtors recently obtained an approximately $6,400,000 loan under the Paycheck Protection Program, which they plan to use on payroll and other expenses allowed under the program, including future rent.

15. The Debtors are filing this chapter 11 petition in order to preserve the going concern value of the Debtors' assets and operations, restructure debt as necessary to the operations of the Debtor's business, and negotiate a plan of reorganization and to work with all of their existing landlords to address the impact of the temporary revenue reduction arising from state and city regulations mandating the closure of the dining room at all restaurants.

16. The Debtors have successfully operated a profitable enterprise for many years and are well known in the locations in which they operate. They project that the lifting of closures anticipated over the next two months will rehabilitate their operations.

### III.    DEBTOR'S PRE-PETITION FINANCING

17. Debtors regularly rely on a revolving line of credit and multiple types of loans to help it manage it cash, meet its working capital needs, run its day-to-day operations, fund build-outs of new stores, and invest in capital improvement and growth projects. Debtors have had a relationship with their primary secured lenders and senior subordinated secured lenders since 2018 and 2013, respectively.

18. Prior to the Petition Date, the Debtors entered into certain secured financing agreements with the Lenders. The primary lending agreement was for a total of $26,000,000 across 8 different lenders and 3 different types of loans secured by cash collateral and other assets and equity of Debtors. The primary instrument that governs the agreement is that certain Credit Agreement dated as of October 26, 2018 by and between Management, as borrower and borrower representative, and each of its affiliates, and Monroe Capital Management Advisors, LLC, as administrative agent and lead arranger, as well as the various lenders affiliated with Monroe Lenders (collectively, "Monroe Lenders") ("Credit Agreement"). The Credit Agreement was executed along with certain Schedules to the Credit Agreement, as well as a Guaranty and Collateral Agreement between the same parties that were parties to the Credit Agreement. A summary of the loan commitment amounts for each of these primary secured lenders is as follows:

| Name of lender | Revolving commitment | Term A loan commitment | Total B loan commitment | TOTAL |
|---|---|---|---|---|
| Monroe Capital Corporation | $159,090.91 | $3,500,000.00 | $477,272.72 | $4,136,363.63 |
| Monroe Capital Private Credit Fund II LP | $120,049.40 | $2,641,086.90 | $360,148.21 | $3,121,284.51 |
| Monroe Capital Private Credit Fund II | $16,314.23 | $358,913.10 | $48,942.70 | $424,170.03 |

5

| | | | | |
|---|---|---|---|---|
| (Unleveraged) LP | | | | |
| Monroe Capital Private Credit Fund III LP | $216,005.51 | $4,752,121.20 | $648,016.53 | $5,616,143.24 |
| Monroe Capital Private Credit Fund III (Unleveraged) LP | $56,721.76 | $1,247,878.80 | $170,165.29 | $1,474,765.85 |
| Monroe Private Credit Fund A LP | $250,000.00 | $5,500,000.00 | $750,000.00 | $6,500,000.00 |
| Monroe Capital Private Credit Fund I LP | $136,363.64 | $3,000,000.00 | $409,090.91 | $3,545,454.55 |
| MC Financing SPV I, LLC | $45,454.55 | $1,000,000.00 | $136,363.64 | $1,181,818.19 |
| TOTAL | $1,000,000.00 | $22,000,000.00 | $3,000,000.00 | $26,000,000.00 |

19. Debtors also obtained certain pre-petition secured mezzanine loans in the amount of $7,000,000 from Brookside Mezzanine Fund II, L.P. and Brookside Mezzanine Fund III, L.P. (collectively, "Brookside Mezzanine"). The terms of those loans are contained in that certain Amended and Restated Securities Purchase Agreement dated September 14, 2015 between Management, Acquisition, all of the subsidiaries of Acquisition LLC, Brookside Mezzanine Fund II, L.P., Brookside Mezzanine Fund III, L.P., and Citizens Bank, N.A. ("Amended and Restated Securities Purchase Agreement"). The Amended and Restated Securities Purchase Agreement was executed at the same time as two Amended and Restated Senior Subordinated Notes, as well as an Amended and Restated Guaranty and Security Agreement between the same parties. The Amended and Restated Securities Purchase Agreement was subsequently amended by that certain First Amendment dated May 27, 2016, that certain Second Amendment dated July 6, 2017, and that certain Third Amendment dated October 26, 2018. A summary of the loan amounts for each of these subordinate secured lenders is as follows:

| Name of lender | Total loans |
|---|---|
| Brookside Mezzanine Fund II, L.P. | $3,500,000.00 |
| Brookside Mezzanine Fund III, L.P. | $3,500,000.00 |
| TOTAL | $7,000,000.00 |

20. All of the loans between Debtors and Monroe Lenders and Brookside Mezzanine were secured by collateral pursuant to the respective guaranty and collateral/security agreements between the parties, wherein Debtor granted to Lenders security interests in and liens upon all

6

52923581;1

assets of the Debtor. Monroe Lenders' interest is allegedly secured by collateral consisting of all "cash collateral" within the meaning of 11 U.S.C. § 363(a) as well as all personal property, intellectual property, receivables, equity interests, and other types of property. Brookside Mezzanine's interest is allegedly secured by collateral consisting of all "cash collateral" within the meaning of 11 U.S.C. § 363(a) as well as all other goods (including but not limited to fixtures) and personal property, whether tangible or intangible, and also pledged stock.

21. Prior to the commencement of this case, Monroe Lenders and Brookside Mezzanine executed an intercreditor agreement dated October 26, 2018 wherein Brookside Mezzanine subordinated its lien in favor of Monroe Lenders as to Debtors' collateral that secure both Lenders' loans ("Subordination and Intercreditor Agreement").

22. As of April 29, 2020, the amount Monroe Lenders claims is due it by Debtors pursuant to the Pre-Petition Senior Secured Loan Agreements is $25,515,000 ("Senior Secured Debt") and the amount Brookside Mezzanine claims is due it pursuant to the Pre-Petition Subordinated Secured Loan Agreements is $7,265,236 ("Subordinated Secured Debt").

23. In the one-year period preceding the commencement of this case, the net interest paid on loans and related fees averaged $167,130 per month for Senior Secured Debt.

24. The Debtors estimate that the value as of April 29, 2020 of the cash collateral is (i) $5,759,149 in cash and cash equivalents; and (ii) $619,202 in accounts receivable. The Debtors estimate that the value as of April 29, 2020 of the fixed assets is (i) $592,712 in inventories and supplies; (ii) $14,818,075 in equipment and leasehold improvements; and (iii) $25,235 in deposits and other assets. Prior to the COVID-19 pandemic, annual EBITDA on a consolidated basis exceeded $6,700,000 based on the February 2020 trailing twelve month period. If market multipliers for similarly situated restaurant chains were applied to EBITDA for the Debtors' pre-pandemic businesses, and, Debtors anticipate that the enterprise value expected

once operations stabilize post-pandemic would be between $44,000,000 and $50,000,000. Since the total value of Senior Secured Debt and Subordinated Secured Debt total approximately $32,780,236, the value of Debtors' enterprise far exceeds the value of any Lenders' liens.

## IV. FIRST-DAY MOTIONS AND NECESSITY FOR EMERGENCY HEARINGS[2]

25. As President and CEO of Management, I am generally familiar with the contents of each First Day Motions (including the exhibits thereto) described in further detail herein. Based upon that general familiarity and the information provided to me by other members of the Debtors' management team and my colleagues who report to me or provide information to me in the ordinary course of the Debtors' business, I believe that the relief sought in each First Day Motions is necessary to: (a) prevent additional loss of valuable employees; (b) enable the Debtors to operate in Chapter 11 with minimal disruption or loss of productivity and value; (c) allow the Debtors to continue serving valued customers and operating the business pending a restructuring of its debt; and (d) prevent immediate and irreparable harm to the Debtors' businesses as a whole. Concurrently herewith, the Debtor has filed or will be filing the following First Day Motions for which the Debtor requests that the Court conduct a hearing as soon as possible after the commencement of the Debtor's bankruptcy case (the "First Day Hearing"):

i. Debtors' Emergency Application For Approval, on an Interim and Final Basis, of Employment of Michael I. Goldberg, Eyal Berger and the Law Firm of Akerman LLP as General Bankruptcy Counsel for the Debtor-In-Possession Effective as of the Petition Date;

ii. Debtors' Emergency Motion For Entry of an Order Authorizing the Debtors to Use Cash Collateral and Provide Adequate Protection;

iii. Debtor's Emergency Motion for Entry of an Order: (I) Authorizing the Payment of Priority Pre-Petition Wages, Salaries, Earned Bonuses, and Employee Benefits; and (II) Authorizing the Debtor to Continue the Maintenance of Employee Practices and Benefit Plans and Programs in the Ordinary Course of Business;

---

[2] Any capitalized terms not otherwise herein defined are ascribed the same meaning as in each respective First Day Motion.

26. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical and necessary to the Debtor's ability to maximize the value of its assets for its creditors and shareholders, maintain their day-to-day operations, and generally maintain and preserve the going concern, enterprise value of the business.

27. The Debtor will provide notice to all motions presented to the Court for consideration as First Day Motions on all parties identified on the master service list.

**A. Debtors' Emergency Application for Approval, on An Interim and Final Basis, of Employment of Michael I. Goldberg, Eyal Berger and the Law Firm of Akerman LLP as General Bankruptcy Counsel for the Debtor-In-Possession Effective as of the Petition Date**

28. The Debtors seek authority to retain, on an interim and final basis, Michael I. Goldberg, Esq. ("Mr. Goldberg"), Eyal Berger, Esq. ("Mr. Berger") and the law firm of Akerman LLP ("Akerman") as general bankruptcy counsel effective as of the Petition Date. The Debtors understand that Mr. Goldberg, Mr. Berger and Akerman have extensive experience representing Chapter 11 debtors in this district (and others across the country), and that they are well-qualified to serve as general bankruptcy counsel to the Debtors. The Debtors believe it is in the Debtors' best interests, and those of its creditors, that Mr. Goldberg, Mr. Berger and Akerman be retained to serve as Debtors' general bankruptcy counsel in its Chapter 11 case.

29. To the best of the Debtors' knowledge, except as disclosed in the Declaration of Eyal Berger, on behalf of Akerman LLP, as proposed counsel for the Debtors, neither Mr. Berger nor Akerman has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

30. I am aware that corporations may not appear in a Florida or Federal court within Florida *pro se*, and that only a licensed attorney may appear on their behalf. Because there is a

myriad of relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of counsel before a final hearing on the Application for approval of counsel's employment can be convened. For example, the Debtors require the Court's approval of an agreement for the use of cash collateral. Without the use of cash, the Debtors will be unable to operate its business and maximize the value of its assets for the benefit of its estate. It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided. In that regard, counsel advises that this relief has been granted in other Chapter 11 cases in this District. Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to retain Akerman as its counsel.

**B.     Debtors' Emergency Motion For Entry of an Order Authorizing the Debtors to Use Cash Collateral and Provide Adequate Protection.**

31.     The Debtors seek authorization to use the cash collateral of Lender pursuant to a 13-week cash collateral budget prepared by the Debtors for the period from April 29, 2020 through July 28, 2020.

32.     In connection with the Debtors' proposed use of cash collateral and in order to provide the Monroe Lenders with adequate protection for the aggregate diminution of the cash collateral resulting from the Debtors' use thereof, the Debtors have agreed, subject to approval of this Court, that the Monroe Lenders, shall have, *nunc pro tunc* as of the commencement of this Chapter 11 case, a replacement liens pursuant to section 361(2) of the bankruptcy code on and in all property of the Debtors acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the property of the Debtors securing the prepetition obligations to the Lender under the Pre-Petition Loan Documents. In addition, the Debtors have consented to the payment of $140,000 in monthly adequate protection payments to

Monroe Lenders that equate to slightly less than the average $167,130 per month (when interest rates were higher) in contractual interest and other charges the Debtors were paying Monroe Lenders under the Pre-Petition Senior Secured Loan Agreements.

33. The Debtors propose to use the cash collateral strictly in accordance with the terms of that certain Budget prepared by the Debtors. The Budget covers the period from April 29, 2020 through July 28, 2020. The Debtors also requests that they be authorized: *(i)* to exceed any line item on the Budget by an amount equal to ten percent (10%) of each such line item; or *(ii)* to exceed any line item by more than ten percent (10%) so long as the total of all amounts in excess of all line items for the Budget do not exceed ten percent (10%) in the aggregate of the total Budget.

34. Supplemental to the replacement liens provided to the Monroe Lenders, the Debtors will furnish as required by the Pre-Petition Senior Secured Loan Agreements and Pre-Petition Subordinated Secured Loan Agreements or other reports as the Monroe Lenders reasonably request.

35. An immediate and critical need exists for the Debtors to be permitted access to cash collateral in order to continue to operate their businesses and preserve their ongoing, enterprise value. If the Debtors are not allowed to use cash collateral, their business operations will be substantially interrupted. This would result in a significant diminution in the value of the Debtors' assets (including the cash collateral) to the detriment of the Debtors' creditors and interest holders and other harm to the Debtors' respective estates. The proposed use of cash collateral, therefore, is essential to sustain the Debtors during this Chapter 11 case and to prevent irreparable harm to the Debtors' estate. The Budget provides adequate funds to pay anticipated administrative expenses during the pendency of this Chapter 11 case.

36. The proposed use of cash collateral is necessary, essential and appropriate for the continued operation of the Debtors' business, and the preservation of the assets of the estate. Given the circumstances of this case and of the Debtors, the terms of the use of cash collateral are fair, reasonable and adequate, and in the best interest of the Debtors' estate. The use of cash collateral provides the Debtors with working capital pursuant to the Budget, pending approval of the use of cash collateral on a permanent basis at the Final Hearing. The Debtors and I submit that granting of the relief sought is necessary and appropriate and in the best interests of the Debtors, its creditors, its shareholders and its customers.

C. **Debtor's Emergency Motion for Entry of an Order: (I) Authorizing the Payment of Priority Pre-Petition Wages, Salaries, Earned Bonuses and Employee Benefits; and (II) Authorizing the Debtor to Continue the Maintenance of Employee Practices and Benefit Plans and Programs in the Ordinary Course of Business.**

37. The Debtor, Management, is requesting the entry of an order authorizing the Management to (a) pay various pre-petition wages, salaries, earned bonuses and employee benefits of the Debtor's employees, and (b) continue the Debtor's various pre-petition Employee practices, benefit plans and programs provided by the Debtor in the ordinary course of its business.

38. As of the Petition Date, the Debtor employed approximately 290 full and part time employees, including management, service technicians, and administrative support staff ("Employees"). The Debtor, through Paymaster, a professional employer organization, pays its employees every other week with its next payroll set to be paid on May 12, 2020. The payroll for the employees to be distributed on May 12, 2020 is for the pay period ending May 5, 2020, which will include 9 days of pre-petition employee obligations, from April 20, 2020, through and including April 28, 2020. The total amount of gross wages due to be paid to Paymaster for the pre-petition payroll is approximately **$366,244.10**.

39. The Debtor also seeks authority to pay an earned performance bonus for approximately one-hundred and twenty (120) employees for the period of the first quarter. The total amount due and owing for prepetition compensation bonuses is **$109,855.84** for the period of January 1, 2020 to March 29, 2020. The Debtor also pay its payroll taxes each payroll cycle through Paymaster and Debtor was current on the Petition Date.

40. As part of the foregoing relief, the Debtor also seeks authorization to pay all federal and state withholding and payroll-related taxes relating to pre-petition periods including, but not limited to, all withholding taxes, Social Security taxes, and Medicare taxes, as well as all other withholdings such as life insurance and other employee deductions, if any. Store managers and bakery commissary managers are entitled to a quarterly bonus, based on performance, including sales, labor, cost of goods controls, that is part of their bonus compensation plan. The Earned Bonuses amount for each employee is based on the level of the managerial employee, from 5% to 15% of yearly base paid out quarterly. Typically, these employees' bonuses for the first quarter are paid in April, and therefore Debtor requests authority to pay the earned bonuses no later than Friday, May 1, 2020. These employees have met the metrics for entitlement to the Earned Bonuses and their compensation is earned pursuant to their employment agreements with Debtor.

41. The Debtor has established various employee benefit plans and policies for the benefit of its employees which include medical, and life insurance, vacation pay, personal time off and other similar benefits (collectively, the "<u>Employee Benefits</u>"). The Debtor seeks authority to honor these obligations the ordinary course of business. The Debtor provides its health and life insurance directly to employees through deductions in payroll paid to Paymaster on the Employees' behalf.

42. All regular, full-time hourly Employees are eligible to accrue paid sick and personal days. The Debtor seeks authority to honor in the ordinary course of business all liabilities to its Employees that arose under its vacation and personal day policies prior to the Petition Date. The Debtor anticipates that its Employees may utilize any accrued vacation time or personal days in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtor's normal payroll obligations. Any accrued vacation lapses at the end of each calendar year.

43. The Debtor has sufficient funds designated to pay the payroll costs of its employees. The Debtor recently received a loan in the amount of approximately $6,400,000 through the Paycheck Protection Program ("PPP") pursuant to the title II of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act.") The PPP loan may be used for, among other things, (I) payroll costs; (II) costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums; and (III) salaries, commissions, or similar compensations. The Debtor intends to honor that obligation by using the proceeds for such purposes, and other purposes as allowed by the CARES Act. The Debtor contends that the proceeds of the PPP loan is not cash collateral.

44. I believe that the relief requested in the Motion will enable the Debtor to maintain its current operations without interruption, thereby preserving the value of the business, and, at the same time, maintain employee morale. Without the relief requested, the Debtors' ability to represent and protect its clients, preserve the Debtors' going concern value and maximize the value of its assets for all creditors of its estate will be adversely affected if the Debtor is unable to retain its dedicated and loyal Employees.

## V. DEBTORS' OBJECTIVES IN THIS CASE

45. The primary purposes of the filing of this Chapter 11 Case is to, among other things: (a) continue the Debtors' operations while in Chapter 11 with as little disruption as possible; (b) allow the Debtors to continue serving its valued customers and operate its business pending a restructuring of its debt, and (c) establish procedures for the smooth and efficient administration of this case. Through the motions described above and other motions and applications the Debtors may file later, the Debtors hope to minimize any adverse effects that this Chapter 11 case might otherwise have on its business, employees, and its customers. For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

52923581;1

## 28 U.S.C. § 1746 Declaration

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 29, 2020.

_____
Edward Maxwell Piet
President and CEO of TooJay's Management LLC